DORIS HAMILL WOODWARD ET AL. *v.*
HERMAN NEWSTEIN ET UX.

[No. 1163, September Term, 1976.]

*Decided September 13, 1977.*

The cause was argued before MOYLAN, POWERS and MOORE, JJ.

*David M. Williams* for appellants — cross-appellees.

*Craig T. Walsworth* and *Roger Sanders*, with whom were *Henry, Hairston & Price* on the brief, for appellees — cross-appellants.

MOORE, J., delivered the opinion of the Court.

The appellants in this negligence action, plaintiffs below, sustained personal injuries while engaged in the interesting, and sometimes rewarding, diversion of looking at realty on a Sunday afternoon.[1] The trial court (Rasin, J.) forestalled their effort to recover damages for their injuries when he granted appellees' motion for summary judgment.

Appellants contend here that their claim to the status of invitees was erroneously rejected and that the finding in effect of the trial court that they were trespassers, as a matter of law, should be reversed. They also argue for an abandonment of the traditional distinctions between trespassers, licensees and invitees. We hold that the case was correctly decided on the basis of applicable Maryland law and affirm the judgment.

## I

With one exception,[2] the injured parties in this litigation are out-of-state residents, owning weekend and vacation homes at Chesapeake Landing in Kent County. The appellees, Herman Newstein and his spouse, E. Marjory Newstein, reside in Narberth, Pennsylvania, near

---

* Note: *Certiorari* denied, Court of Appeals of Maryland, April 4, 1978.

1. Doris Hamill Woodward, Joseph DiSanto and Evelyn T. Sparre were the injured appellants. The other two appellants, Inez DiSanto and Dallas Sparre, were joined in the suit as respective spouses.

2. Appellant Joseph DiSanto is a full-time resident of Kent County, having first established a home there in 1964.

Philadelphia, where the husband is a professor in physics and meteorology at Drexel College. They purchased two lots on Mill Creek in Chesapeake Landing in 1966 and built a house which was completed in June, 1967. In the intervening years, the house had not been leased but had been used by the couple approximately two weekends each month, with longer visits during summer vacations. Ingress and egress was principally by a series of wooden steps leading to a porch overlooking the Creek. A door opened from the porch into the living area of the house.

In 1970, Mr. Newstein decided to sell the property and placed advertisements in newspapers in the Philadelphia, Baltimore and Washington areas as well as in Chestertown, Kent County. The advertisements identified it by general location only and sought to effect a sale by the owners.

Subsequently, at a time not precisely established but prior to July 1, 1971, a limited listing of the property was given to Old Shore Realty & Co. of Chestertown. According to Mr. Newstein, this was for the purpose of protecting the commission rights of the brokerage firm with respect to one, named, prospective purchaser. Notwithstanding the limited nature of this listing, the Realty Company advertised the property, along with a number of other listings, in the Kent County News in October, 1972. The portion of the advertisement describing the appellees' property read as follows:

"MILL CREEK — An exciting home on a secluded, wooded lot with 203' of waterfront. Living rm. w/fireplace, dining area, modern kitch., bath, & 2 bedrooms. There is a large aboveground basement w/fireplace & sliding glass doors for an ideal family rm. Private pier. Immediate possession. $39,750." [3]

Only the appellant DiSanto had seen this advertisement. Neither he nor the others had seen any of appellees' 1970 advertisements prior to the day of the accident.

---

[3]. At the bottom of the advertisement, the address and telephone number of the realty company were given along with the names and telephone numbers of four real estate brokers in the firm.

Appellant Doris Woodward and Margaret Pelarcik, both residents of Coatesville, Pennsylvania, jointly owned a house in Chesapeake Landing not far from the Newsteins. Appellants Evelyn Sparre and her husband were residents of Wilmington, Delaware, and also owned a vacation home along the banks of Mill Creek. Appellants Joseph DiSanto and his wife had, three months earlier, purchased and occupied a home across the way from Mrs. Woodward and Mrs. Pelarcik.

Mr. DiSanto stated in his deposition that he joined the three ladies at the Woodward-Pelarcik residence some time between 4:30 and 5:00 p.m. on Sunday, March 10, 1974. At the suggestion of one of the group, they decided to go for a ride. As they drove within sight of the Newstein property, DiSanto told the others that it was for sale. (He later testified in his deposition that he had seen the advertisement of Old Shore Realty 18 months previously and also had heard it discussed in the community that the property was for sale.) They parked in the driveway and looked around. There were no signs of any kind. The house was unoccupied at the time by the Newsteins but they stated they had been there within the month and that the house was completely furnished. One of the group, Mrs. Sparre, ascended the outside steps to obtain a view of the Creek from the porch. The other three followed her, Mrs. Pelarcik being last. As Mrs. Pelarcik was about to step onto the deck, the structure collapsed and her three companions — Mrs. Sparre, Mrs. Woodward and Mr. DiSanto — fell to the concrete below and sustained serious injuries.

The builder who constructed the home and who was also engaged to rebuild the porch, testified that dampness had caused the timbers to rot and that this was the cause of the collapse.

In their declaration, the appellants alleged that "in response to the open, public and notorious offers to sell [they] did venture onto the aforesaid described real estate, having an interest to view said property for the purpose of determining if one or any of them would be interested in

purchasing the same from the defendants and, as a result thereof, the said plaintiffs were business invitees. . . ."

The appellees' motion for summary judgment came after extensive discovery proceedings. Some eleven depositions were taken, including those of the injured appellants and Mrs. Pelarcik, both of the appellees, and three residents of the area, who testified that they knew the property was for sale in 1971 or 1972 and in 1973.

Also deposed was William Oakes, a partner in the Old Shore Realty firm, who testified that from May 1971 to October 1973, he showed the property on 21 separate occasions. On only three, was the interior of the house inspected and on those occasions the Newsteins were present. He was unsure whether Professor Newstein was aware of the other 18 visits, when he escorted various clients around the exterior of the house only. He did not have a key to the property. Mr. Oakes said he learned from Mr. Newstein in December, 1975 that the property was off the market. The Newsteins confirmed in their testimony that on the three occasions mentioned they were present when the house and grounds were shown to three prospects but denied any knowledge of the 18 other visitations.[4] The date as of which they decided to discontinue the sale of the house is unclear.

## II

The basic thrust of this appeal is that the appellants were business invitees, express or implied, that at all events their status was a question for the jury to determine and, under all the facts and circumstances, the issue should not have been resolved on a motion for summary judgment.

It is, of course, elementary that the function of summary judgment is not to try the case or to decide issues of fact; but

---

4. The trial court in a memorandum opinion on the motion for summary judgment made a finding that the owner "acquiesced in Old Shore Realty Company showing the property to a number of prospective purchasers." We consider *infra* appellants' contention that the court thus improperly resolved an issue of fact, there being a conflict between the testimony of Mr. Oakes and that of Professor Newstein.

to determine whether or not there is an issue of fact to be tried and, if there is none, to cause judgment to be rendered accordingly. Maryland Rule 610; *Lynx, Inc. v. Ordnance Products, Inc.*, 273 Md. 1, 7, 327 A. 2d 502 (1974); *Salisbury Beauty Schools v. State Board of Cosmetologists*, 268 Md. 32, 40, 300 A. 2d 367 (1973); *Rosenthal v. Al Packer Ford, Inc.*, 36 Md. App. 349, 374 A. 2d 377 (1977). In determining the propriety of granting a motion for summary judgment, we are concerned with whether the trial judge was correct in his determination that there was no genuine dispute as to material facts. *Broadwater v. Arch*, 267 Md. 329, 335, 297 A. 2d 671 (1972); *Fitzgerald v. Montgomery County*, 25 Md. App. 709, 711, 336 A. 2d 795 (1975). Even if, however, the facts are undisputed but are susceptible of more than one reasonable inference, the party against whom the inference is sought to be made is entitled to the inference most favorable to his position. *Hill v. Lewis*, 21 Md. App. 121, 133, 318 A. 2d 850 (1974), and cases cited therein.

In the case *sub judice*, it is our view that there were no disputes as to material facts, and there is no support, in fact or in law, for the position of the appellants that they were business invitees, "express or implied."

Maryland law with respect to the liability of owners or occupiers of land is, of course, well-settled. The Court of Appeals reiterated in *Bramble v. Thompson*, 264 Md. 518, 521, 286 A. 2d 265 (1972), one of its most recent pronouncements on the subject, that the liability of a property owner to an individual injured on his property is dependent upon the standard of care owed to that individual; and that standard is, in turn, contingent upon the individual's status while on the property, *i.e.*, whether he is a trespasser,[5] licensee or invitee. *Accord, Carroll v. Spencer*, 204 Md. 387, 104 A. 2d 628 (1954); *Kight v. Bowman*, 25 Md. App. 225, 333 A. 2d 346 (1975); *Fitzgerald v. Montgomery County, supra.*

---

5. In Osterman v. Peters, 260 Md. 313, 315, 272 A. 2d 21 (1971), the Court of Appeals noted that Maryland was one of seven states which reject the doctrine of attractive nuisance without qualification.

The definitions of these categories and the standards of care applicable to each are succinctly stated by Judge Digges in *Bramble v. Thompson, supra,* 264 Md. at 521-22. In the instant appeal, we are primarily concerned with the status of an invitee,[6] to whom is owed the duty to use reasonable and ordinary care to keep the premises safe and to protect from injury caused by an unreasonable risk which the invitee himself, in the exercise of ordinary care for his own safety, will not discover. *Id.* at 521. While the standard of care is thus free of difficulty, there is, as Dean Prosser points out, an "important conflict of opinion as to the *definition* of an invitee, as well as to whether certain visitors are to be included in this category." (Emphasis added.) W. Prosser, *Law of Torts* § 61, at 386 (4th ed. 1971). An invitation may be express or implied and the conflict to which the learned author refers is largely concerned with the definition of an implied invitee.

In the case at hand, it is beyond doubt that there was no express invitation. *See Gray v. Sentinel Auto Parts Co., supra,* 265 Md. at 66. The injured appellants admitted that they never requested the permission of either the appellees or any representative of Old Shore Realty to enter upon the property; and the appellees emphatically stated that they never extended such an invitation. The newspaper advertisements, the most recent of which preceded the accident by one year and a half, omitted the address of the advertised property and, far from requesting an inspection of the premises, deliberately withheld such invitation.[7]

---

6. It will be observed that the court did not in Bramble v. Thompson advert to the definition of invitee contained in § 332 of the Restatement (Second) of Torts (1965); nor was this definition referred to in the later case of Gray v. Sentinel Auto Parts Co., 265 Md. 61, 288 A. 2d 121 (1972), decided a month after *Bramble.* That section defines an invitee as "either a public invitee or a business visitor."

7. For cases where the plaintiff was expressly invited to inspect the premises *see, e.g.,* Coughlin v. Harland L. Weaver, Inc., 230 P. 2d 141 (Ct. of App., Calif. 1951) (court reversed motion for nonsuit granted in favor of defendant-realty agency under circumstances where plaintiff was injured while inspecting a house to which she was invited by realtor and an "Open For Inspection" sign was posted in front of premises); Davidson v. Borough of Upland, 136 A. 2d 155 (Penn. 1957) (court upheld trial court's finding of "business invitee" where plaintiff was given keys to inspect an apartment by renting agent, but jury award reversed on basis of insufficient evidence of negligence); Hall v. Glick, 110 A. 2d 836 (Penn. 1955) (court affirmed jury

In our judgment, the court below correctly analyzed appellants' claim when it stated in the memorandum opinion granting the motion that if the plaintiffs were to prevail, it had to be found that there was an "implied invitation." Neither the uncontradicted facts nor the law permits such a finding, as the lower court correctly held.

Appellants seem to rely here upon either one or both of the theories recognized and applied by the Court of Appeals in the determination of implied invitee status. We refer to the so-called *mutual benefit doctrine*, characterized by the Court of Appeals as the "older theory," *Gray v. Sentinel Auto Parts Co., supra,* 265 Md. at 66, and what is called the "more recent theory," namely, the *implied invitation doctrine. Id.* Judge Finan pointed out in *Gray* that Judge Henderson (later Chief Judge) first analyzed these concepts under the Maryland cases in *Crown Cork & Seal Co. v. Kane,* 213 Md. 152, 131 A. 2d 470 (1957), in which the Court held that there was sufficient evidence to support an implied invitation and that the submission of that issue to the jury was without error. Judge Henderson explained that the mutual benefit theory predicates liability upon a finding that the individual on the premises was present for the mutual benefit of owner and visitor and not acting solely for his own personal pleasure or benefit.[8] The later theory, as Judge Henderson pointed out, does not depend on mutual benefit at all. He went on to explain:

"But there is another theory of liability for negligence that does not depend on mutual benefit

award in favor of plaintiff injured while being escorted around apartment for rent by owner); Bonello v. Powell, 223 S. W. 1075 (Mo. 1920) (trial court's finding that plaintiff was a business invitee affirmed where owner and realtor invited plaintiff to inspect property, but jury award reversed on other grounds); Singleton v. Kubiak and Schmitt, Inc., 101 N.W.2d 619 (Wis. 1960) (jury award in favor of plaintiff reinstated where court found that there was sufficient evidence of defendant's negligence in failing to exercise reasonable care to protect the plaintiff, a prospective purchaser, from injuring himself after the defendant-owner expressly invited the plaintiff to inspect newly constructed homes.)

8. Both Mr. DiSanto and Mrs. Woodward deposed that they had no specific interest in purchasing the property but that they would have considered it if they liked what they saw. Mrs. Sparre, however, indicated that she had no such intention. *See* Kalus v. Bass, 122 Md. 467, 89 A. 731 (1914).

at all. The cases all recognize that an invitation may be express or implied, and there are many cases in which an invitation has been implied from circumstances, such as custom, the acquiescence of the owner in habitual use, the apparent holding out of premises to a particular use by the public, or simply in the general arrangement or design of the premises." 213 Md. at 159.

Application of the mutual benefit theory generally involves the conduct of a business by the possessor of land. (When that business is a retail store, the open door is truly an invitation during regular business hours.) Under the alternative theory, before the status of invitee may be established by implication, there must be, in the conduct or words of the possessor, some inducement or encouragement to enter, and mere permission or acquiescence is not sufficient. As the Restatement points out in comment a. to § 332, *supra,* " 'Invitee' is a word of art, with a special meaning in the law. This meaning is more limited than that of 'invitation' in the popular sense, and not all of those who are invited to enter upon land are invitees." In determining the existence or not of an invitation in the legal sense, the Restatement goes on to point out that "the important thing is the desire or willingness to receive that person which a reasonable man would understand as expressed by the words or other conduct of the possessor." Restatement § 332, comment c.

In this case, no invitation could reasonably be construed under either theory from the words and conduct of the Newsteins or of Old Shore Realty, even assuming that the latter was agent for the owners. The following facts compel this conclusion:

(a) The advertisements placed by the owners were grossly out-of-date, having been published almost four years prior to the accident;

(b) Even if the date of the advertisements were not a factor, they disclosed only a post office box number and a telephone number of the owners in

Narberth, Pennsylvania. Any reader capable of ascertaining the property's location, clearly could not assume that the advertisement was an invitation to inspect the house without first contacting the owner;

(c) Similarly, the advertisement placed by Old Shore Realty in September and October, 1972 was also of somewhat ancient vintage and "deliberately" left undisclosed the address of the described premises to assure that any prospective buyer would first contact the real estate agency;

(d) The owners of the property posted no "For Sale" sign or signs, gave no key to the premises to any individual for purposes of inspection and had never discussed with appellants or any other neighbors their intentions with respect to a sale of the property; [9]

(e) The fact that several neighbors of the Newsteins, Lorraine and Michael Purcell and Paul Getz, understood that the property was for sale and that the Purcells on two occasions visited the property, is immaterial. In determining whether the Newsteins impliedly invited individuals onto their property, their own conduct, and that of their agents, not that of their neighbors, is alone relevant. Neither the Purcells nor Mr. Getz testified that their entry onto the Newstein property was prompted by acts of the Newsteins or Old Shore;

(f) Even if, as the trial court found, the owners had acquiesced in the showing of the premises to some 18 prospects when the owners were not present on the grounds, such escorted inspections can only reasonably be interpreted as a

---

9. Mr. Newstein stated in his affidavit accompanying the motion for summary judgment that he did on one occasion, back in 1970 or 1971, tell a neighbor that he *might* sell the property.

requirement that prospective purchasers be accompanied by an owner's representative.

Cases in other jurisdictions arising under facts more favorable to the injured plaintiffs support our conclusion that there was no implied invitation here. Thus, in *Mortgage Commission Servicing Corp. v. Brock,* 4 S.E.2d 669 (Ct. of App. Ga. 1939), the plaintiff responded to a Sunday newspaper advertisement of an apartment for rent. The advertisement gave the address but also provided the name of the realty agent, its address and telephone number. One evening thereafter, without first contacting the realty agency, the plaintiff went to inspect the apartment. She tripped in a dark hallway and fell down a flight of stairs. In affirming the trial court's order dismissing the plaintiff's complaint, the court stated:

"Clearly it [the advertisement] contains no express invitation to the public to inspect any of the premises listed in the advertisement, and candor requires the view that it holds out no implied invitation. It merely calls the attention of the reader to the fact that certain unfurnished apartments are available for leasing. . . . There is not in the body of the advertisement, at its beginning or at its end, any statement from which the implication could reasonably be drawn that any interested party was at liberty to proceed on Sunday, or at any other time, to inspect the apartments. . . . The only reasonable construction to be placed upon it is that the owner, through its agents, was informing the public of certain premises which were available for leasing at named rentals, and that if anyone was interested he was invited to communicate with Draper-Owens Co. [the agent] . . . . The insertion of the particular advertisement without an express invitation does not, therefore, carry with it the implication that the reader was invited to inspect the premises

without first communicating with the [realtor]."
4 S.E.2d at 672.

We find singularly appropriate the language of the Supreme Judicial Court of Massachusetts in the case of *Wilkie v. Randolph Trust Co.*, 55 N.E.2d 466 (Mass. 1944), where injuries were sustained when house seekers came back to the premises in the evening after having surrendered the keys which they had obtained from the realtor when they inspected the house in the early afternoon. In sustaining a report of an auditor who found for the defendant-property owners, the court stated:

> "The building was closed so far as the reception of prospective buyers was concerned. This condition of the property, even though it was on the market for sale, would not constitute an invitation to the general public, or even to those who might be desirous of becoming owners, to enter upon the premises for the purpose of inspecting them without any consent or any further action by the owner. *The situation is entirely different from that of a storekeeper, the maintenance of whose shop creates a continuous invitation during the usual business hours to all members of the public who desire to trade with him.* Here, the owner retained the right to select the persons who should go upon the land and examine the house. Even though the plaintiffs were still considering the purchase of the property when they made the second visit, they did not acquire the status of invitees in the absence of some conduct upon the part of the defendant which induced them to make this visit." (Emphasis added.) 55 N.E.2d at 467-68.

These decisions apply *a fortiori*, we think, to a situation where, as here, there was no sign on the property, where two of the visitors who were injured accepted the *ipse dixit* of their companion that the property was for sale and where the latter's information was based on an advertisement 18 months before, and some talk in the locality.

The appellants rely on *Fogarty v. Bogert*, 69 N.Y.S. 47 (App. Div. 1901) to support their position. In *Fogarty*, the plaintiff was injured when, in response to a "Flat to Let" sign posted on the first floor of an apartment, she ventured downstairs to make inquiry of the janitor. The Appellate Division (2nd Dept.) reversed the trial court's dismissal of the plaintiff's declaration. The court's holding, however, makes clear that it based its decision on the tendency of the building's design to attract visitors on the first floor to go down to the basement to make inquiries and, therefore, the owner was responsible for exercising due care in the construction of the stairwell. The case is factually inapposite to the case *sub judice.* Similarly, we find appellants' reliance on *Blankenship v. Wagner*, 261 Md. 37, 273 A. 2d 412 (1971) to be misplaced. *Blankenship* involved the application of *res ipsa loquitur* and the court had no occasion to discuss the varying standards of care owed by a property owner to one injured on his premises.

Based on the undisputed material facts, the trial court correctly found that the appellants entered the property without an express or implied invitation, and as trespassers or, at best, bare licensees, *see Bramble v. Thompson, supra,* were owed only the duty to refrain from wanton and wilful injury. As there is no evidence of such wanton or wilful conduct, the appellees were entitled to judgment as a matter of law.

### III

As previously noted, Professor Newstein stated in his deposition that he was never informed by Mr. Oakes that the agent showed the property to approximately 18 prospective purchasers. Mr. Oakes, on the other hand, testified, by referring to his telephone records, that he had received prior approval for most of these visits from the appellees. In the memorandum opinion, the trial court resolved the issue, stating:

> "Although the defendant's claim [that their property] was listed [with Old Shore] for the sole

> purpose of being offered to one prospective buyer, *the Court finds from the conduct of the owners that they acquiesced in Old Shore Realty Co. showing the property to a number of prospective purchasers.*" (Emphasis added.)

The appellants now contend that the trial court's decision must be reversed since "there was a material dispute" as to the issue of whether the Newsteins acquiesced in Old Shore showing the property to these other clients. We find this contention to be wholly without merit.

Maryland Rule 610 d.1. provides that the entry of a summary judgment shall be rendered if upon the "pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine dispute as to any *material fact* and that the moving party is entitled to a judgment as a matter of law." (Emphasis added.) The Court of Appeals in *Salisbury Beauty Schools v. State Board of Cosmetologists, supra,* in discussing the term "material fact," stated:

> "Even where it is shown that there is a dispute as to a fact, when the resolution of that factual dispute is not material to the controversy, such dispute does not prevent the entry of summary judgment; . . . a dispute as to facts relating to grounds upon which the decision is not rested is not a dispute with respect to a *material* fact and such dispute does not prevent the entry of summary judgment." (Citations omitted.) 268 Md. at 40. *Accord, Hill v. Lewis, supra,* 21 Md. App. at 133.

The trial court's decision in this case that the appellees did not impliedly invite the appellants onto their property, did not rest upon the resolution of the factual dispute between Mr. Newstein and Mr. Oakes as to whether the owner acquiesced in his agent's showing the property on these other occasions. The crucial issue before the court was whether the appellees' conduct, and that of their agent, justifiably created the impression that the appellants could

enter the Newstein property without first contacting the owners or Old Shore. The material fact with regard to the 18 visits by other prospective buyers was that their entries were *accompanied* by Mr. Oakes, *i.e.*, they first contacted the realty agency *before* entering the premises. As to this point, there was no dispute. The disputed fact was whether the appellees had acquiesced in these visits, the resolution of which was not material to the ultimate issue confronting the court.[10] It is plain that the trial court properly resolved the motion for summary judgment based on the material undisputed facts.[11]

## IV

Appellants' next contention is that:

"The lower court did abuse its discretion by refusing to revise its rulings on the motion for summary judgment in order to permit the appellants to amend their Declaration to include causes of action that they were trespassers, lured, enticed, tolerated and anticipated and foreseen."

After the trial court issued its decision granting the appellees' motion for summary judgment, the appellants filed a "Motion for Reargument and/or For Amendment and/or Appropriate Relief" pursuant to Maryland Rule 625. In their motion the appellants requested two types of alternative relief:

1) That "the court reverse itself with respect to the matter of whether or not the facts showed the Plaintiffs were business invitees;" or,

10. The resolution of whether Old Shore was authorized to show the property on the 18 occasions would, of course, have been material in a suit by one or more of the 18 persons had they been injured on the appellees' property.

11. We note in passing that in one part of the appellants' brief they argue that the fact that the appellees acquiesced in Old Shore showing the property to 18 clients, as the trial court found, created an implied invitation to others that they might also enter. In a subsequent section, referred to *infra*, appellants contend that since Mr. Newstein did not expressly authorize these visits, the 18 entries constituted trespasses, thereby putting the appellees on notice as to the foreseeability of further trespasses.

> 2) That "the court should permit an amendment of these pleadings adding an additional and new cause of action to the effect that they were trespassers on a business venture which [sic] were enticed to come upon the Defendants' premises for a business purpose based upon a tolerated, known, continuous, habitual trespass for that purpose."

The trial court properly denied the appellants' motion.

In the first instance, as discussed above, the lower court was correct in its finding that the appellants were not "business invitees."

The trial court also properly denied appellants' request for leave to amend their Declaration. Maryland Rule 320 c.1 provides that "In a case heard or tried before the court without a jury, any amendment may be made *at any time before a final judgment* or decree is entered." (Emphasis added.) Here, appellants' motion to amend their declaration was filed *after* the trial court rendered a final judgment in favor of the appellees. In any event, they were not entitled to the amendment because the causes of action sought to be asserted are not recognized in Maryland and we can find no abuse of the court's discretion under Maryland Rule 625 a. *See Fitzgerald v. Montgomery County, supra.*

V

Appellants' final contention is that it is against the public interest for the courts of Maryland to continue to apply the varying standards of care owed to individuals injured on another's property solely by reason of the visitor's classified status as invitee, licensee or trespasser.

We recognize that there is a modern common law trend towards the abolition of the rigid classifications of trespasser, licensee and invitee.[12] *Smith v. Arbaugh's*

---

12. As Prosser points out, dissatisfaction with the rigid common law categories led to the adoption in England, in 1957, of the Occupiers' Liability Act, 5 & 6 Eliz. II, c. 31 which abrogated the distinction between licensees and invitees and declared that the occupier owes the same "common duty of care" to both. The law as to trespassers was not affected. *Law of Torts, supra,* at § 62.

*Restaurant, Inc.,* 469 F. 2d 97 (D.C. Cir. 1972); *Rowland v. Christian,* 443 P. 2d 561 (Calif. 1968); *Mile High Fence Co. v. Radovich,* 489 P. 2d 308 (Colo. 1971); *Pickard v. City and County of Honolulu,* 452 P. 2d 445 (Hawaii 1969); *Ouellette v. Blanchard,* 364 A. 2d 631 (N.H. 1976); *Basso v. Miller,* 386 N.Y.S.2d 564 (1976); *Mariorenzi v. Joseph DiPonte, Inc.,* 333 A. 2d 127 (R.I. 1975). *See* Annot. 32 A.L.R.3d 508 (1970).

In its place, these other jurisdictions by judicial decision now impose on occupiers of land a single duty of reasonable care to refrain from injuring visitors on their property; and although a person's status as a trespasser, licensee, or invitee may still be considered as a factor in the determination of liability, other factors such as the foreseeability of the visitor's presence and the time, manner, place and surrounding circumstances of his entry, become relevant in the ultimate decision. *See Smith v. Arbaugh's Restaurant, Inc., supra,* 469 F. 2d at 106. The rationale for this trend is felicitously explained by Mr. Justice Stewart in the case of *Kermarec v. Compagnie Generale,* 358 U. S. 625, 630-31 (1959), where the Court refused to import to admiralty law the conceptual distinctions of the common law:

> "The distinctions which the common law draws between licensee and invitee were inherited from a culture deeply rooted to the land, a culture which traced many of its standards to a heritage of feudalism. In an effort to do justice in an industrialized urban society, with its complex economic and individual relationships, modern common-law courts have found it necessary to formulate increasingly subtle verbal refinements, to create subclassifications among traditional common-law categories, and to delineate fine gradations in the standards of care which the landowner owes to each. Yet even within a single jurisdiction, the classifications and subclassifications bred by the common law have produced confusion and conflict. As new

distinctions have been spawned, older ones have become obscured. Through this semantic morass the common law has moved, unevenly and with hesitation, towards 'imposing on owners and occupiers a single duty of reasonable care in all circumstances.' "

Whether Maryland should move in this direction — if indeed that question is properly before us since it was not raised below — is not for this Court but rather, the Court of Appeals, to decide. On the other hand, as Chief Judge · McSherry expressed it, speaking for the Court in *Demuth v. Old Town Bank*, 85 Md. 315, 320, 37 A. 266 (1897):

"It is for the Legislature by appropriate enactments and not for the Courts by metaphysical refinements to provide a remedy against the happening of hardships which may result from the consistent application of established legal principles."

*Judgment affirmed; appellants to pay the costs.*